**GREATER ROCKFORD ENERGY AND TECHNOLOGY CORP., Shepherd Oil Inc., Vidalia Ethanol, Ltd., Alpebo, Inc., Shreveport Ethanol, Inc., Lakefield Ethanol, Inc., A.E. Montana, Inc., Cepo, Inc., Texas Ethanol Producers, Wurster Oil Co., High Plains Corporation, Cajun Energy, Inc., Public Terminals, Inc., and People of the State of Illinois, Plaintiffs,**

**v.**

**SHELL OIL COMPANY, Marathon Petroleum Company, Amoco Oil Company, Chevron, U.S.A., Inc., Atlantic Richfield Co., B.P. America, Citgo Petroleum Corp., Diamond Shamrock R & M, Inc., Exxon Company USA, Mobil Corporation and Sinclair Oil Corp., Defendants.**

**No. 90–3119.**

United States District Court, C.D. Illinois, Springfield Division.

April 24, 1992.

See also 777 F.Supp. 690, 138 F.R.D. 530.

Wendell W. Wright, Wright & Wright, Danville, Ill., Bob F. Wright, Domengeaux & Wright, Lafayette, La., Lloyd W. Gathings, Gathings & Davis, Birmingham, Ala., Gregg R. Potvin, Taylor Thiemann & Aitken, Washington, D.C., Wayne M. Liao, Spiegel Liao & Kagay, San Francisco, Cal., for Greater Rockford Energy & Technology Corp., Vidalia Ethanol Ltd., Alpebo, Inc., Shreveport Ethanol, Inc., Lakefield Ethanol, Inc., A.E. Montana, Inc., Cepo, Inc., Texas Ethanol Producers, Wurster Oil Co., Inc. and High Plains Corp.

Peter M. Sfikas, Peterson & Ross, Chicago, Ill., Carl D. Haggard, Shell Oil Co., A.M. Minotti, Shell Oil Co., Ann Spiegel, Houston, Tex., for Shell Oil Co.

John H. Stroh, Dan D. Sandman, Findlay, Ohio, Ronald Teeple, John Leonard, Defrees & Fiske, Chicago, Ill., for Marathon Petroleum Co.

Thomas A. Gottschalk, David A. Rammelt, J. Andrew Langan, Kirkland & Ellis, Martin J. Keating, Michael E. Rigney, Chicago, Ill., Robert E. Gillespie, Hinshaw & Culbertson, Springfield, Ill., Amy J. Berenson, Kirkland & Ellis, Washington, D.C., for Amoco Oil Co.

Thomas W. Kelty, Pfeifer & Kelty P.C., Springfield, Ill., John E. Bailey, Keith E. Parks, Mark A. Cervenka, Chevron Corp., David L. Ream, Houston, Tex., John H. Long, Long Morris Myers & Rabin P.C., Springfield, Ill., for Chevron U.S.A. Inc.

Donald A. Brigh, Dean M. Harris, Atlantic Richfield Co., Los Angeles, Cal., for Atlantic Richfield Co.

Joseph Dattilo, Cleveland, Ohio, for B.P. America.

Robert G. Abrams, Joanne E. Caruso, Howrey & Simon, Washington, D.C., for Exxon Co. USA.

Jeffery M. Cross, Patrick J. Ahern, Mary Clare Bonaccorsi, Ross & Hardies, Chicago, Ill., Edward H. Beck, Fairfax, Va., R. Gerald Barris, Sorling Northrup Hanna Cullen & Cochran, Ltd., Springfield, Ill., for Mobil Oil Corp.

A. James Shafter, Kehart Shafter Hughes & Webber P.C., Scott A. Roberts, Decatur, Ill., for Archer Daniels Midland Co.

Neil Hartigan, Asst. Atty. Gen., Springfield, Ill., Bart T. Murphy, Asst. Atty. Gen., Robert E. Davy, Jr., Lison & Pullman, John McCaffrey, Atty. Gen. Office, Citizens Rights Div., Chicago, Ill., for the People of State of Ill.

Leslie J. Schiff, D. Patrick Keating, Sandoz, Sandoz & Schiff, Opelousas, La., for Cajun Energy, Inc., and Public Terminals Inc.

David R. Samuelsen, Poole & Samuelsen, Boise, Idaho, for Ethanol Marketing.

## OPINION

RICHARD MILLS, District Judge:

The arcane mysteries of antitrust standing.

And—like all legal concepts—there is a chameleon quality to this principle.

Antitrust law might be summarized as a great, albeit maddeningly imprecise, panacea of the anticompetitive ailments of free enterprise.

"Antitrust laws in general, and the Sherman Act in particular, are the Magna Carta of free enterprise. They are as important to the preservation of economic freedom and our free-enterprise system as the Bill of Rights is to the protection of our fundamental personal freedoms." *United States v. Topco Associates, Inc.,* 405 U.S. 596, 610, 92 S.Ct. 1126, 1135, 31 L.Ed.2d 515 (1972).

"One problem presented by the language of § 1 of the Sherman Act is that it cannot mean what it says. The statute says that 'every' contract that restrains trade is un-

lawful. But, as Mr. Justice Brandeis perceptively noted, restraint is the very essence of every contract; read literally, § 1 would outlaw the entire body of private contract law...." *National Soc. of Professional Engineers v. United States,* 435 U.S. 679, 687–688, 98 S.Ct. 1355, 1363, 55 L.Ed.2d 637 (1978) (footnotes omitted).

While the Supreme Court has stated that "it is virtually impossible to announce a black-letter rule that will dictate the result in every case," the Supreme Court has identified the relevant factors to be considered. *Associated General Contractors of California, Inc. v. California State Council of Carpenters,* 459 U.S. 519, 536, 103 S.Ct. 897, 908–911, 74 L.Ed.2d 723 (1983).

This matter is before the Court on a joint summary judgment motion on behalf of all Defendants based on Plaintiffs' alleged lack of antitrust injury and standing.

The bottom line: Allowed. Case dismissed.

## I. BACKGROUND

### Parties

More than 70 lawyers have now appeared in this case. Over 750 pleadings have been filed producing a case file which, if placed in a single stack, would exceed twelve feet in height.

Since this case presents a classic example of the saying "you can't tell the players without a program," we start with a review of that "program."

Plaintiffs and Plaintiff–Intervenors (hereafter referred to collectively as "Plaintiffs") fall into three basic groups: ethanol producers, gasohol blenders, and the State of Illinois.

Plaintiffs Greater Rockford Energy and Technology Corporation, Shepherd Oil, Inc., Vidalia Ethanol, Ltd., Alpebo, Inc., Shreveport Ethanol, Inc., Lakefield Ethanol, Inc., A.E. Montana, Inc., CEPO, Inc. and Texas Ethanol Producers, are ethanol producers and/or sellers. Plaintiff–Intervenor Wurster Oil Company, Inc. is a gasohol blender and has sold to distributors, but it is appar-

ently suing only in its capacity as a seller of ethanol.

Plaintiff–Intervenors Cajun Energy, Inc. and Public Terminals, Inc. are gasohol blenders who sell to distributors and dealers.

Plaintiff State of Illinois has intervened as a Plaintiff "on behalf of all Illinois citizens, the State of Illinois and its political subdivisions."

The Defendants are major oil companies and all are members of the American Society for Testing and Materials (ASTM) and the American Petroleum Institute (API). Defendants are Shell Oil Company, Marathon Petroleum Co., Amoco Oil Company, Chevron U.S.A., Inc., Atlantic Richfield Co., B.P. America, Exxon Company U.S.A. and Mobil Corporation.

In addition to the parties described above, three parties made unsuccessful attempts to intervene as Plaintiffs and several Defendants settled out. Furthermore, diversity between the Plaintiffs and the Defendants is *not* complete.

### Complaints

The complaints of all Plaintiffs contain essentially the same five counts:

Count I alleges a contract, combination or conspiracy in violation of section 1 of the Sherman Antitrust Act.

Count II alleges violations of section 26a of the Clayton Antitrust Act (the Gasohol Competition Act of 1980).

Count III alleges monopolization activities in violation of section 2 of the Sherman Antitrust Act.

Count IV alleges violations of the Illinois Fraud and Deceptive Practices Act and monopolization activities in violation of the Illinois Antitrust laws.

Count V alleges commercial disparagement in violation of the Illinois Fraud and Deceptive Practices Act.

Plaintiffs seek treble damages in the amount of 2.85 billion dollars as well as various injunctive relief.

The original complaint was filed on June 1, 1988 in the Danville Division of the Central District of Illinois by Plaintiffs Greater Rockford Energy and Technology Corporation, Shepherd Oil, Inc., Vidalia Ethanol, Ltd., Alpebo, Inc., Shreveport Ethanol, Inc., Lakefield Ethanol, Inc. and A.E. Montana, Inc. All of these original Plaintiffs are—or were—ethanol producers. Other Plaintiffs were allowed to intervene later, including the State of Illinois which filed its complaint on March 2, 1990. This case was reassigned to this judge and division on May 21 of the same year.

The State of Illinois claims to have been injured as follows:

a. Illinois motorists and motorists nationwide have been forced to pay higher prices at the pump for motor fuel than they would have had to pay, if defendants had not suppressed competition between gasohol and gasoline in the motor fuel marketplace.

b. Illinois citizens engaged in the production, distribution and sale of ethanol and gasohol have lost jobs and profits as a result of defendants' illegal activities.

c. Illinois farmers and others connected with the agricultural economy of Illinois have lost jobs and profits as a result of the decreased production and sale of corn, [more] than would have occurred had defendants not substantially prevented the widespread entry of ethanol and gasohol into the mainstream of the motor fuel industry.

d. The quality of the environment and the public health have been adversely affected by defendants' exclusionary activities. Gasoline blended with 10% ethanol significantly reduces harmful emissions of carbon monoxide from motor vehicles into the atmosphere. In addition, ethanol is a more efficient and safer octane enhancer than those used by defendants. Due to the suppression of ethanol from the motor fuel market, Illinois citizens and citizens across the nation have been deprived of the health benefits of gasohol.

e. The local governments of Illinois, the State of Illinois itself and ultimately Illinois taxpayers have had to expend larger sums of money and will have to spend even greater sums of money to comply

with the federal Clean Air Standards because of the greater pollution of the atmosphere from the burning of gasoline as opposed to gasohol.

f. The general economy of the State of Illinois has been injured and damaged because of the loss of economic development that the State would have enjoyed if the ethanol industry had not been severely crippled by defendants' conduct. Illinois is now and has been capable of producing hundreds of millions of gallons of fuel ethanol annually. New investment in plant and equipment in Illinois required to produce the ethanol necessary to meet the increased demand in a free and competitive motor fuel market would approximate one (1) billion dollars. The ripple effect of this new capacity upon the Illinois economy would be enormous. These effects include jobs created in the construction, plant operations, transportation, seed and feed industrial stimulation, fertilizer manufacturing, and other economic benefits.

The only monetary relief sought by the State of Illinois were Illinois statutory penalties. But those prayers for statutory civil penalties were dismissed by an earlier court order, leaving the State of Illinois in this suit only to pursue injunctive relief.

### Prior Motions Based on Standing

At a hearing on April 14, 1989, Judge Baker denied Defendants' motion to dismiss for lack of standing to sue. In a short order entered on April 17, 1989, the Court concluded that "the allegations of the pleadings, fairly read, show that the plaintiffs are competitors of the defendants in the market for non-diesel automotive fuels, and that the plaintiffs have alleged direct antitrust injury."

On May 21, 1990, Judge Baker recused himself and the case was reassigned this case to the Springfield Division. On November 9, 1990, this Court denied a subsequent motion to dismiss stating that "on the limited record before us we cannot determine whether Plaintiffs are in fact actual competitors of the Defendants or merely more remote suppliers of direct competi-

tors. At the conclusion of discovery, and upon a more complete record, we can revisit this issue."

### The Current Motion

Discovery has now closed and the record is no longer limited—in fact, it is so voluminous that it would fill a five-drawer filing cabinet. Defendants have now moved for summary judgment based on Plaintiffs' lack of antitrust standing and injury. Because standing determinations are factually intense, we review the record, particularly Plaintiffs' Final Statement of Contentions and Proof in excruciatingly painful detail.

### Contentions and Proof

Plaintiffs were ordered to file both a preliminary and a final statement of contentions and proof. The contents of their Final Statement of Contentions and Proof (hereafter "Final Statement") are generally not organized or identified on a count-by-count basis. They quote at length from the Senate and House reports on the Gasohol Competition Act of 1980 and argue that the Act, as well as actions by other government agencies, show government acceptance of 10% ethanol blended fuels as quality fuels. The contentions which follow are drawn from Plaintiffs' Final Statement.

Plaintiffs broadly complain that Defendants "flouted Congress' intent and will expressed in the Gasohol Competition Act of 1980, and undertook a concerted and ruthless program of lawlessness, unfair competition, and anti-competitive conduct."

They state that each of the Defendants market their motor fuel through branded, vertically integrated distribution systems in competition with ethanol producers and blenders. They then contend that they "compete with defendants at every level of the integrated petroleum industry from refining down the stream." By way of example, Plaintiffs state that "in distilling ethanol with gasoline to make gasohol, plaintiffs engage or engaged in activities equivalent to defendants' operations that made crude oil into gasoline. In seeking customers for ethanol, or gasohol for distribution

or resale, plaintiffs compete with defendants' distribution and marketing operations."

Plaintiffs also contend, rather incredibly, that "[s]ince defendants manufacture and market motor fuels throughout the country, plaintiffs compete with defendants in 48 contiguous states."

They opine that Defendants subjected their dealers to "economic serfdom" through interrelated agreements including a lease, a product supply contract and the trademark license. Plaintiffs state that branded franchising affords the Defendants "a great degree of certainty about how much crude oil and refined product" they will move. They also asseverate that branded franchising "effectively precludes the system of 'open supply.'" Plaintiffs then assert that "[t]he Gasohol Competition Act of 1980 to a substantial degree could have created an open supply system."

They argue that "Defendants had an understanding to discriminate against and to disparage ethanol and gasohol so as to eliminate competition from ethanol and gasohol in the motor fuels market in violation of the antitrust laws." Apparently, the Court is to consider this alleged "understanding" as being a "contract, combination or conspiracy in violation of section 1 of the Sherman Antitrust Act" as alleged in Count I of Plaintiffs' complaint.

Plaintiffs avow four bases for their assertion of Defendants' understanding and/or their assertion that Defendants violated the Gasohol Competition Act of 1980. It is claimed that:

(A) each Defendant engaged in conduct that unreasonably discriminated against or limited the sale, resale, or transfer of gasohol, in violation of 15 U.S.C. § 26a;

(B) Defendants unlawfully limited the use of credit card instruments in transactions involving the sale, resale or transfer of gasohol;

(C) Defendants further unreasonably discriminated against or unreasonably limited the sale, resale, or transfer of gasohol through other anti-alcohol activities which decreased public acceptance of gasohol and deterred dealers and jobbers from selling gasohol;

(D) Defendants communicated among themselves and other co-conspirators sensitive competitive information about the marketing of motor fuels including ethanol and gasohol.

We examine each of Plaintiffs' four asserted bases in turn.

A. Unreasonable Restrictions on Gasohol

In support of their contention that "each Defendant engaged in conduct that unreasonably discriminated against or limited the sale, resale, or transfer of gasohol, in violation of 15 U.S.C. § 26a," Plaintiffs declare that:

(1) **Defendants refused to permit use of existing tanks and pumps, regardless of ownership, for storage and dispensing of gasohol.**

In support of this assertion, Plaintiffs' provide approximately four pages of quotes from House and Senate Reports dealing with *past* actions by major oil companies that the Gasohol Competition Act of 1980 was intended to address.

Plaintiffs further aver that "defendants through contractual agreements and the terms thereof ["contracts" for short], as well as other communications to jobbers and dealers, have uniformly prohibited the use of existing tanks and pumps for gasohol." In an accompanying footnote, the various methods of prohibiting dealers from using existing tanks for gasohol are listed, including the use of supply agreements requiring the dealer to purchase minimum quantities from the oil company (Exxon), requiring dealers to sell all three grades of the oil company's gasoline leaving, in most cases, no underground storage tanks available for gasohol (Shell), and prohibiting dealers from "splash blending" ethanol with branded gasoline and selling it as a branded product (Chevron).

(2) **Defendants either failed to inform their dealers and jobbers of company gasohol policies or continued to change gasohol policies which left the dealers and jobbers in the dark about**

the conditions under which they could market gasohol if they chose to do so.

(3) Defendants exhibited a strong antigasohol attitude, coupled with strongly worded suggestions that the dealers and jobbers must check with company representatives before they began marketing gasohol.

(4) Through their debranding policies, Defendants imposed unreasonable labeling requirements on their dealers and jobbers which substantially impaired and unreasonably limited them in marketing gasohol.

(5) Defendants either threatened to terminate the franchises of dealers who sold gasohol or issued subtle threats which had the effect of discouraging their sale of gasohol.

The only evidence presented in support of this allegation were quotes from a Senate Report dealing with conduct of oil companies *before the passage of the Act.*

### B. Credit Card Instruments

To support their contention that "Defendants unlawfully limited the use of credit card instruments in transactions involving the sale, resale or transfer of gasohol," Plaintiffs maintain that Gulf Oil Company, which was purchased by BP America and Chevron U.S.A., and Amoco refused to allow their credit cards to be used for the purchase of gasohol (except insofar as Amoco allowed its card to be used to purchase Amoco branded gasohol, where it marketed gasohol), while Shell imposed a 3½% charge on gasohol purchases, and Atlantic Richfield "and others" required that special procedures be followed and that notations be made on credit card receipts for the sale of gasohol, all allegedly in violation of the Gasohol Competition Act of 1980.

### C. Other Antigasohol Activities

In support of the contention that "Defendants further unreasonably discriminated against or unreasonably limited the sale, resale, or transfer of gasohol through other anti-alcohol activities which decreased public acceptance of gasohol and deterred

dealers and jobbers from selling gasohol," Plaintiffs assert that:

(1) Defendants engaged in an anti-alcohol campaign which had the effect of discouraging the motoring public from buying gasohol and discouraging dealers and jobbers from selling gasohol.

Plaintiffs claim that gasohol, which they parenthetically define as "ethanol enriched fuels" (although the term actually refers to gasoline blended with either ethanol or methanol), was a well accepted, high quality motor fuel. Between 1980 and 1986, ethanol sales increased steadily from 50 million gallons per year to eight hundred million gallons per year. Defendants realized that ethanol was useful from the standpoint of adding octane to fuel, especially in light of the need to phase-out lead which also boosted octane. Chevron purchased a majority interest in a Kentucky ethanol production facility and blended its own gasohol which it sold in Kentucky and portions of Tennessee. During that time, Chevron touted "the product" as being a high quality motor fuel. Amoco purchased ethanol directly from refiners, blended it with Amoco gasolines, and sold it as a branded product in certain parts of the Midwest, including Iowa, Nebraska, North Dakota and South Dakota. In the areas that Amoco marketed gasohol, Amoco touted its high quality.

It is argued by Plaintiffs that "[t]he Gasohol Competition Act allowed branded dealers to handle the product at branded locations by simply debranding the pump and continuing to use existing tanks and pumps."

Defendants, beginning with Shell, Amoco, Marathon and Chevron allegedly began to "disparage ethanol" by disseminating misleading information. "The most obvious and conspicuous campaign was the practice by which the defendants' adorned their branded stations with point of sale sign materials which shouted that the product sold ... contained no alcohol, ethanol or methanol." [Plaintiffs' accompanying 5–page endnote makes reference to numerous signs stating "No Alcohol" and does not mention a single sign specifically refer-

ring to ethanol or methanol.] It is argued that the clear implication of these signs was "that somehow, there was something wrong with gasoline blended with 10% ethanol."

Plaintiffs also complain that:

The point of sale materials omitted any reference to the actions of Congress and the EPA and other government agencies and auto manufacturers recognizing the quality of gasohol. They were further silent about the national energy policy to encourage the use of ethanol, and that gasoline dealers had a lawful right to sell gasohol. Defendants used the point of sale materials to convey the misleading message that gasohol was an inferior fuel.

Plaintiffs asseverate that Defendants "No Alcohol" advertising was misleading because it "disparaged gasohol by concealing the fact that ethanol was different than other alcohols." They provide a list of the states where each Defendant conducted their anti-alcohol campaigns; only three Defendants, Mobil, Marathon and Atlantic Richfield are listed as having conducted anti-alcohol campaigns in Illinois. Plaintiffs state that they still had not identified all the areas wherein Shell conducted its campaign.

**(2) Defendants have prohibited the storage of ethanol at their terminals and thereby prohibited the blending of ethanol [and gasoline] at their terminals while permitting the storage and blending of other Defendants' detergent additives and MTBE at the same terminals.**

Plaintiffs state that Defendants have gasoline terminals throughout the United States. These terminals are used to distribute gasoline to branded jobbers and dealers and to other oil companies having exchange agreements with the oil company which owns the terminal. Defendants' terminals store various blending agents and detergent additives of the oil companies involved in the exchange agreements, but "will not accord the same distribution benefits to ethanol, prohibiting its storage at their terminals, despite offers to pay for any necessary facilities for storage *by*

*those wishing to store ethanol."* (Emphasis ours). [Plaintiffs do not allege that any Plaintiff approached any Defendant's terminal, offered to pay for ethanol storage and was rebuffed.] Plaintiffs complain that Defendants "have subjected *those entities wishing to blend ethanol* to unnecessary expense and burden caused when their trucks have to fill up with gasoline at the defendants' terminals and then travel to another bulk storage facility in another location to load the required amount of ethanol into the truck." (Emphasis ours).

Plaintiffs also allege an unreasonable limitation on the sale and transfer of gasohol as a result of Defendants' requirements that trucks picking up gasoline arrive empty and pick up a full load. Plaintiffs argue that this requirement "necessitated that *those wanting to blend gasoline with ethanol"* go to another facility, unload part of the gasoline, and fill up the rest of the tank with ethanol. (Emphasis ours).

**(3) Defendants prohibited dealers and jobbers from using Defendant-supplied gasoline for blending with ethanol.**

MTBE (methyl tertiary butyl ether) is an oxygenate manufactured by Defendants and blended into some of their gasoline. If the gasoline is more than 2% MTBE by volume, EPA regulations prohibit the gasoline from being blended with ethanol. Plaintiffs assert that by refusing to disclose whether their gasoline contained MTBE or the amount of MTBE the gasoline contained, Defendants' prohibited dealers and jobbers from blending the Defendants' gasoline with ethanol. In an endnote, Plaintiffs explain that the dealers and jobbers would have to have the gasoline tested by a laboratory in order to know whether it could be blended with ethanol. The endnote does not state whether Defendants knew the MTBE contents of each gasoline delivery or whether Defendants would have to pay for testing of MTBE content in able to provide that information to the dealers and jobbers.

**(4) Defendants arbitrarily and unreasonably refused to allow their branded dealers and jobbers to sell gasohol manufactured by those Defendants themselves**

if the sales were not to be made within a geographic area strictly defined by that Defendant.

D. Communication Among Conspirators

In support of the contention that "Defendants communicated among themselves and other co-conspirators sensitive competitive information about the marketing of motor fuels including ethanol and gasohol," Plaintiffs assert that:

**(1) Defendants' officers and employees attended various meetings of the American Petroleum Institute (API) where there were discussions or proceedings related to discouraging acceptance or marketing of ethanol and gasohol.**

The API is the leading oil industry trade association and each Defendant is a member. Plaintiffs complain that after the American Society for Testing and Materials (ASTM) delayed for years in adopting a specification for gasohol and the National Conference on Weights and Measures (NCWM) and the States began pressing the ASTM for a gasohol specification, API acted to exclude "anyone other than their ASTM group from promoting a legal specification for gasohol." The alleged action to exclude everyone except ASTM from the process consisted of distributing a "referendum ballot proposing two public statements opposing ethanol and gasohol." The two proposed public statements were:

(1) API should support the technical concept in the proposed [ASTM] specification for automotive spark-ignition engine fuels that all fuels should have the same volatility specifications regardless of their composition.

(2) API should oppose legislative and regulatory initiatives that would establish specifications for spark-ignition engine fuels before the ASTM specification can be completed.

The two statements that Plaintiffs characterize as "opposing ethanol and gasohol" speak only of "spark-ignition engine fuels;" while gasohol falls within that definition, ethanol, by itself, does not. A 38 page endnote to Plaintiffs' claim that API's actions excluded anyone other than the ASTM from promoting a legal specification for gasohol completely fails to explain how the two proposed public statements on the referendum ballots excluded anyone from proposing legal specifications for gasohol. (The reason that the endnote is not fully apposite to the accompanying statement may be because that same endnote is referenced at several different places in Plaintiffs' Final Statement.)

**(2) Defendants' officers and employees attended various meetings of Consumers for Competitive Fuels where there were discussions or proceedings related to discouraging acceptance or marketing of ethanol and gasohol.**

Plaintiffs' contend that the purpose of this association of fuel companies was "to exchange views on the 'immediate problem of ethanol.'" [Plaintiffs' quote is unattributed.] Plaintiffs assert that "[t]hrough the proceedings of this coalition Defendants have frequently and regularly discussed issues relating to the sale, marketing and transfer of gasohol."

**(3) Defendants' officers and employees attended various meetings of the special interest oil and gas associations where there were discussions related to discouraging jobbers and dealers [from] marketing gasohol.**

Plaintiffs assert that Defendants are represented in various oil and gas associations and that these associations "afforded the defendants' representatives *extensive opportunity* to meet and orchestrate opposition to gasohol." (Emphasis ours).

**(4) Defendants' officers and employees attended various meetings of the [ASTM] where there were discussions and proceedings conducted to discourage acceptance or marketing of ethanol or gasohol.**

ASTM's purpose is "the development of standards on characteristics and performance of materials, products, systems and services." The ASTM group dealing with gasoline is Subcommittee A of Committee D02 (Subcommittee D02.A). Specification D–439 is the standard specification for gasoline.

ASTM standards are routinely adopted by legislatures and government agencies as

legal definitions of various products. For example, the majority of states define gasoline by direct reference to ASTM standard D–439; other states closely track D–439 in their gasoline specifications.

Plaintiffs boldly conclude, therefore, that "as a practical matter, an automotive spark-ignition engine fuel that does not meet ASTM specifications cannot be legally sold in the United States."

Plaintiffs claim that the lack of a motor fuel specification that included gasohol put suppliers of ethanol for blending into gasohol and blenders and sellers of gasohol at a competitive disadvantage. It is stated that when gasohol became a potential entrant into the motor fuel market it was outside the scope of specification D–439. The volatility level of gasohol usually exceeded the ASTM standard D–439 volatility level by approximately one pound per square inch. In both 1979 and again in 1982, the EPA granted gasohol a one pound per square inch waiver from the volatility regulations. Plaintiffs avow that this federal action preempted state and local gasoline specifications that might have excluded gasohol on the basis of volatility." They opine that Congress' enactment of the Gasohol Competition Act left "no doubt where gasohol stood in the eyes of federal law" and therefore there "should have been no doubt about the need for a timely motor fuel specification that included gasohol."

Plaintiffs declare that by December, 1979 Defendants "obviously aware of the legal mandate of the EPA volatility waiver," formed the ASTM Oxygenated Fuel Task Force to consider gasohol and prepare a specification. During 1980 and 1981, ASTM Committee D–2 published an information document and a proposed specification for gasohol that essentially combined existing ASTM gasoline and ethanol requirements.

From December, 1982 to December, 1983, Defendants began working on a modification of D–439 to include oxygenates generally rather than focusing on the initial gasohol specification. Despite ASTM procedures providing for the adoption of emergency specifications while a proposal went through the normal standard-writing process, Defendants did not adopt an emergency specification for gasohol. On December 6, 1983, § 1 of Subcommittee A met in Miami and unanimously voted to recommend to Subcommittee A that the existing D–439 standard specification be revised to include a paragraph on gasoline-oxygenate blends.

Plaintiffs profess that the clear purpose of the December 6, 1983, vote was to abandon the most straightforward means of adopting a gasohol specification and to delay the creation of a specification for gasohol by "submerging gasohol within the large generic group of gasoline-oxygenate blends." They maintain that "[f]rom 1984 to mid–1986 the proposed gasohol specification, and for that matter any new ASTM motor fuel specification, stalled." Plaintiffs insist that the ASTM's activities ignored Congress' mandate in the Gasohol Competition Act of 1980, and concentrated on whether or how the EPA volatility waiver should be recognized in drafting a new ASTM motor fuel specification.

Plaintiffs allege that in mid–1986, the National Conference of Weights and Measures was pressing ASTM for a gasohol specification and began considering writing its own specification. This allegedly led Defendants to discuss at the 1987 American Petroleum Institute meeting how to maintain control over the standards writing process through the ASTM.

**(5) Defendants' officers and employees attended various meetings of the National Conference on Weights and Measures where there were discussions and proceedings conducted to discourage acceptance or marketing of ethanol and gasohol.**

The NCWM membership consists of government weights and measures regulators from various states. As part of its motor fuel related activities, the NCWM meets and adopts various standards for service station gasoline pump labeling. Plaintiffs assert that the Defendants "have consistently followed and attempted to influence the activities of the NCWM in writing and adopting these standards" and

that, in the process, Defendants had numerous opportunities "to confer and collude to oppose the marketing of gasohol." As an example of how the NCWM activities gave Defendants the opportunity to collude against gasohol, Plaintiffs point to Defendants' united opposition to a motor fuel specification not written by ASTM. They accuse Defendants of having misused their dominance of ASTM to delay a gasohol specification and damage the ethanol industry.

In mid–1986, the NCWM took the unprecedented step of preparing its own draft specification. This is what led Defendants to take action at the API meeting to oppose any non-ASTM specification. On March 26, 1987, the letter ballot for proposed specification ASTM P–176 was transmitted to Subcommittee D02.A along with a memorandum from Subcommittee Section 1 Member A.L. Muller of Amoco. Muller indicated that at the Subcommittee's December 1987 meeting they recognized "the urgency to produce a Standard Specification to cover all automotive fuels [including oxygenates] to prevent legislative and other organizations from establishing specifications for motor fuels that could be different from those developed by ASTM."

Plaintiffs conjecture that the purpose of the API's two proposed public statements was to pressure the NCWM not to adopt its own specification. They claim that "[i]n dealing with the threat that NCWM posed, Defendants colluded to exclude competition from gasohol, thus injuring Plaintiffs."

**(6) Defendants communicated with other Defendants concerning matters which would discourage the marketing of gasohol through "sham lobbying."**

Plaintiffs assert that Defendants' representatives have lobbied Congress and various state legislatures in opposition to gasohol tax incentives and in favor of gasohol labeling laws. They state that these lobbying activities afforded Defendants' representatives numerous opportunities to confer and plan marketing efforts to oppose gasohol.

**(7) Defendants used the trade press to communicate with each other about their plans and activities to discourage acceptance or marketing of ethanol and gasohol.**

**(8) Defendants used their various mutual supply exchange arrangements as opportunities to communicate their plans and activities to discourage acceptance or marketing of ethanol and gasohol.**

Plaintiffs state that "[f]or convenience and economy considerations Defendants repeatedly exchanged gasoline with each other to obtain the gasoline from the refineries closer to the station's supply." It is argued that through these exchange agreements, Defendants agree on specifications and oxygenate content that prohibit the gasoline from being blended with ethanol.

**(9) Defendants used their various mutual pipeline arrangements as opportunities to communicate their plans and activities to discourage acceptance or marketing of ethanol and gasohol.**

Plaintiffs declare that "[b]y and large" the major pipelines in the United States that are used to transport gasoline are owned and/or controlled by Defendants. Defendants agree on the gasoline blend that may be transported by these pipelines and therefore control the oxygenate level of the gasoline available for blending with ethanol in specific areas. Plaintiffs state, without any elaboration, that Defendants "agree in their opposition to allowing pipelines to be used for transporting gasohol."

**(10) Defendants communicated with each other through their jobbers about using advertising that attacked the use of alcohol gas blend fuels.**

**(11) In addition to the opportunities for communications to coordinate anti-gasohol activities (discussed in 1–10 above), Defendants have utilized other means and opportunities of communication for the same purposes.**

Plaintiffs support their "other means and opportunities" assertion with an endnote that states that an Exxon branding guideline was obtained from Shell's files.

Plaintiffs offer no separate statement of proof in support of their Illinois state law

claims; rather, they simply state that it is the same as the proof offered in support of Plaintiffs' federal claims.

Included at the end of the Final Statement are four "attachments". A few facts set forth in the last attachment deserve mention.

The last attachment includes a graph showing ethanol fuel sales from 1978 through 1990. This graph shows a continuous increase in ethanol fuel sales from 20 million gallons per year in 1978 to 825 million gallons per year in 1987. From 1987 to 1990 ethanol fuel sales gradually decreased to approximately 710 million gallons. A second chart also shows a constant increase in ethanol blend sales from 1980 to 1985. Finally, a map showing "ethanol blends market penetration" in 1986 indicates that ethanol blends represented slightly more than 24 percent of the fuel sold in Illinois.

### Other Facts

Also in the record are pertinent facts contained in various documents attached to a motion by Defendants to disqualify Plaintiffs' lead counsel. The basis for the motion to disqualify was that Plaintiffs' lead counsel, Bob Wright, who is an 85% shareholder of Plaintiff Alpebo, represented Plaintiffs Alpebo and Shepherd Oil, along with two other companies who are not parties to this action, in a lawsuit against the Secretary of the Department of Agriculture for injunctive and declaratory relief. The complaint in that case contains the following statements and claims:

(1) Plaintiffs Alpebo and Shepherd Oil are in the business of producing fuel ethanol from sugar and molasses feed stocks. Neither Alpebo's nor Shepherd's ethanol plants are capable of using corn or other grain feed stocks and it would require "very substantial" efforts and expenditures to convert the facilities to use those feed stocks.

(2) Of the ethanol fuel produced in the United States, 72% is made from corn, 11% is made from other grains, 11% is made from sugar or molasses, and 6% is made from waste or other feed stocks.

(3) The sector of the ethanol production industry utilizing corn or other grains is dominated by large ethanol producers including Archer Daniels Midland, which produces 60% of all domestically made ethanol, Pekin Energy, which is half-owned by Texaco, South Point Ethanol, which is half-owned by Ashland Oil, and New Energy Co., which is partly owned by E.F. Hutton. These producers or their parent corporations are in strong financial positions.

(4) "Plaintiffs and other sugar and molasses-based producers are, in general, small companies that operate on narrow margins and will face severe hardship and possible insolvency if ethanol prices fall significantly."

(5) A dramatic, worldwide drop in oil prices has reduced gasoline prices and put downward pressure on ethanol prices. At the same time, the price of feed stocks used in making fuel ethanol have remained and can be expected to remain stable at relatively high levels due to federal price support programs. The Secretary of Agriculture has found that many ethanol producers are "threatened with imminent failure because of financial problems due to the decline in energy prices." *Citing* 51 Fed.Reg. 21940 (June 17, 1986).

(6) Producers such as the Plaintiffs whose production comes from sugar, molasses and other non-grain feed stocks are in a "particularly severe" economic situation because they tend to be far smaller and less profitable than the larger concerns that dominate the grain-based sector of the ethanol industry. The feed stock cost for sugar-based producers are higher than those of the grain-based producers.

(7) On May 2, 1986, Secretary of Agriculture Richard Lyng announced in a press release a temporary assistance program to allow ethanol producers to survive and to compete with falling gasoline prices. The temporary assistance program, however, based the subsidy on the amount of grain a producer converted to

ethanol and thereby excluded all non-grain-based producers.

(8) Plaintiffs asserted "irreparable injury" as a result of the Secretary's decision to exclude them from the subsidy program. Plaintiffs stated that they faced the "imminent threat of having to shut down their ethanol production for inability to compete with gasoline at currently low prices. Such shutdowns would be particularly devastating for Plaintiffs because they are relatively small concerns and could well be thrown into insolvency if they are not able to produce and sell ethanol." Plaintiffs further stated that the current program would "exacerbate the economic plight Plaintiffs face and will increase the danger that Plaintiffs will be forced out of business."

In a memorandum of points and authorities in support of a motion for a preliminary injunction in the Department of Agriculture suit, Plaintiffs stated that "the industry is very highly concentrated and dominated by a few large firms, all of whom are eligible for participation in the Secretary's subsidy program. The leading firm, Archer Daniels Midland (ADM), a diversified agri-business conglomerate, has 60% of the domestic fuel ethanol market. ADM reported profits of $167 million in 1985."

On September 29, 1986, summary judgment was granted in favor of the Secretary of Agriculture on the complaint brought by Alpebo, Shepherd and two other companies.

Returning to this case, it appears that many of the Plaintiffs are not in a strong financial position. Along with the statements regarding the financial weakness of Alpebo and Shepherd quoted above, there is evidence in the record of the weak financial status of other Plaintiffs. In response to this Court's request for further briefing on the issue of whether Plaintiffs' lead counsel, Bob Wright, should be disqualified because of his position as president and 85% shareholder of Alpebo and his role in the previous lawsuit, Plaintiffs (other than Cajun Energy and Public terminals) filed a memorandum opposing his disqualification. In that memorandum they stated that Mr.

Wright was handling this case on a contingency basis and "[m]any of the corporations which are plaintiffs may be financially unable to support the ongoing litigation or to pay attorney's fees."

In the State of Illinois' response to Defendants' motion to disqualify Mr. Wright, Illinois stated: "The contributions of Mr. Wright to the advancement of this lawsuit have been and continue to be enormous and irreplaceable. The State of Illinois does not have the allocable resources to vigorously pursue the prosecution of this lawsuit on its own, absent the resources of private counsel, most importantly Bob F. Wright."

An appendix to Defendants' motion for summary judgment is filled with documents, affidavits, and deposition testimony damning to Plaintiffs' case:

A report by Arthur Young in Shepherd Oil's Consolidated Financial Statements for 1986 states that "certain major customers of the Company have announced their withdrawal from marketing blended gasoline using ethanol."

In his remarks to the Louisiana legislature, Patrick Hamilton, President of Agrifuels Refining, Inc., stated that: "The gasohol industry cannot survive without the incentives approved by the legislature in 1979."

Jim Creaghan, speaking as a representative of the Louisiana Ethanol Association and Shepherd Oil urged the Louisiana legislature to pass a bill continuing a tax exemption for ethanol. As Shepherd Oil's representative, he stated: "The tax exemption was vital to the survival and development of Shepherd Oil. Without it, it is probable that Shepherd would not have continued to operate in Louisiana."

The general manager of Cajun Energy testified that following passage of Louisiana's three-inch labeling law, Cajun's sales dropped by 50%. He further testified that the overall Louisiana gasohol market decreased by 66% to 72% as a direct result of the law.

A letter from Citgo Petroleum to Shepherd Oil gave notice that Citgo would no

longer purchase ethanol from Shepherd because Southland Corporation had notified Citgo that they would cease selling blended gasoline in Louisiana. Citgo attributed Southland's decision to the impact of the Louisiana labeling law.

An affidavit of Shepherd Oil's former director of marketing and commodities brims with statements undermining Plaintiffs' contentions. He states that he has seen several serious problems that confront small ethanol producers, which he defined as producers with a production capacity of less than 10 million gallons per year, and make it hard for them to effectively compete. He further stated that small producers "have difficulties achieving suitable economies of scale" and that "[e]ven a producer like Shepherd, which had between 32 and 36 million gallons of theoretical capacity could not achieve economies of scale because manufacturing deficiencies seriously reduced its true output capacity." Shepherd's former director of marketing and commodities observed that ethanol producers using molasses as a feedstock had price and production problems. Shepherd converted its plant to utilize corn because of production requirements and a "homegrown" requirement for obtaining state subsidies.

He also stated that Shepherd and other Louisiana producers faced higher transportation costs because they were outside the midwest which is a principal source of grain. Further, Shepherd had to pay for grain "up front" because of its poor credit rating. He opined that "small producers can only profitably market ethanol in a limited geographic area." Transportation of a hazardous material, such as ethanol, is uneconomical without access to rail and barge transportation. Shepherd and other small producers had access to neither.

Shepherd's former director of marketing and commodities explained that small ethanol producers "faced tough competition from large midwestern ethanol producers" which could achieve economies of scale, had direct access to railroad tracks, had better reliability, were able to ship by railroad track or barge at reduced rates, could capture and sell some of the profitable by-products of their ethanol production and could produce fructose in the Spring and Summer when it is in high demand.

In addition to competition from much larger midwestern producers, the small Louisiana producers competed amongst themselves. At a time when the combined Louisiana ethanol demand was 3 million gallons per year, Louisiana producers had a combined capacity of 8 million gallons per year. Shepherd Oil had problems with moisture content and some of Shepherd's purchasers, including Cajun Energy, produced blends that "caused instances of consumer dissatisfaction" and hurt the public's perception of gasohol. In particular, some Louisiana gasohol users had problems with "vapor lock."

Shepherd's former marketing director also stated that "[e]ven before the discontinuance of the Louisiana state subsidy, Shepherd filed for Chapter 11 bankruptcy protection. When Louisiana discontinued its state subsidy, Shepherd could not survive." He opined that the problems mentioned above "and the drop in the market price of gasoline, accounted for the failure of Shepherd and other small ethanol producers."

Finally, it should be pointed out that the record shows that it was not only the Defendants who voted against the early proposals for a gasohol specification; representatives of alcohol producers including A.E. Staley voted against it as well. A report written by a representative of one of the Defendants concludes that the gasoline producers have no incentive to push through a specification and the gasohol producers are not anxious to be limited by a standard. While Plaintiffs' refer only to a 90% gasoline/10% ethanol blend, that was not the only gasohol on the market; the record reveals that one Plaintiff, Cajun Energy, sold a blend containing as little as 62% gasoline.

### Arguments

#### a. Defendants

Defendants' motion for summary judgment based on lack of antitrust standing and injury seeks summary judgment against the 13 private Plaintiffs involved in this action.

Defendants first argue that under *Southwest Suburban Bd. of Realtors, Inc. v. Beverly Area Planning Ass'n*, 830 F.2d 1374 (7th Cir.1987) each Plaintiff must establish that it is a competitor or consumer in the market that Defendants allegedly restrained in order to have standing. Defendants point out that Plaintiffs' Final Statement alleges that Defendants restrained the market for motor fuels. Defendants then observe that eleven of the private Plaintiffs are ethanol producers and/or sellers. Standing alone, ethanol is not a motor fuel. Rather, it is simply a component of a motor fuel known as gasohol. It is gasohol, not ethanol, that competes with gasoline in the motor fuels market. Defendants point out that in depositions when representatives of the Plaintiffs were asked to identify their competitors, they named ethanol producers such as Archer–Daniels–Midland, A.E. Staley, and Pekin Energy. Plaintiffs did not identify Defendants or other gasoline producers and marketers.

The 11 Plaintiffs who are ethanol producers and/or sellers sell their product to "blenders" who blend the ethanol with gasoline to create gasohol. In fact, one of the Plaintiffs, Lakefield Ethanol, does not even sell to blenders, but instead produces a lower grade ethanol that is sold to an upgrader that processes it and then sells it to a blender. Gasohol blenders mix ethanol and gasoline together, along with other components or additives, to produce gasohol. Defendants take the position that the ethanol producers are analogous to suppliers of a competitor in a restrained market and do not have standing. Plaintiffs Cajun Energy and Public Terminals are gasohol blenders. Defendants argue that they lack standing because they do not sell on a retail level. Public Terminals is basically a blender for Cajun Energy. Cajun Energy buys the gasohol components and provides them to Public Terminals for blending and then markets the finished blend to dealers and distributors.

Defendants maintain that the injuries alleged by the Plaintiffs in this case are indirect rather than direct. It is claimed that Defendants engaged in practices causing their branded dealers and jobbers not to sell gasohol. It would therefore be the dealers and jobbers who were the directly injured parties. Similarly, Plaintiffs' complaints about "no alcohol" advertising fail to allege a direct injury. Plaintiffs say in their Final Statement that the advertising "had the effect of discouraging the motoring public from buying gasohol and discouraging dealers and jobbers from selling gasohol." Defendants argue that the injury to the 11 Plaintiffs that did not produce or sell gasohol would only have been an indirect result of the more direct injury caused to gasohol blenders. However, the injuries of the gasohol blenders that are alleged in this case were also indirect because it could only have resulted from injuries to dealers and jobbers. Defendants opine that dealers, distributors and consumers of motor fuels would be more appropriate plaintiffs.

Defendants further claim that Plaintiffs' alleged injuries are highly speculative. They point to automobile warranty statements discouraging the use of gasohol and media reports criticizing alcohol blended motor fuels. Defendants observe that Plaintiffs' own experts have admitted that automotive warranty statements and media reports would have caused consumers to avoid gasohol purchases.

Defendants also argue that even if Plaintiffs' claim about "no alcohol" advertising is true, the record shows that numerous non-defendants engaged in similar advertising and therefore Plaintiffs' claim that their injuries were caused by the Defendants' advertising is speculative.

Defendants emphasize evidence in the record that Plaintiffs were extremely dependent on ethanol and gasohol subsidy programs and that the discontinuance of

these subsidy programs severely impacted Plaintiffs.

Defendants assert that all of the Plaintiffs are small-scale producers; none of the Plaintiffs actually produced more than 10 million gallons a year and most of them produced less than three million gallons per year.

Defendants stress numerous statements in the record by various representatives of the Plaintiffs on the adverse effects of the Louisiana labeling law.

In addition, Defendants point out that representatives of Shepherd Oil, Lakefield Ethanol, and Greater Rockford testified in depositions that their companies had difficulties competing effectively with large ethanol producers like ADM. They also observe that Plaintiffs have asserted in lawsuits challenging state pump-labeling laws that those laws had a negative impact on their businesses.

Defendants aver that Plaintiffs' claims pose a risk of duplicative recovery and would require complex, if not impossible, damages apportionment. As an example, they point out that Freeport had an output contract with Wurster Oil whereby Wurster bought Shreveport's entire ethanol production. Wurster then blended that ethanol with gasoline and sold the resulting gasohol. Both Wurster and Shreveport are claiming damages for the same alleged violations in this case. The relationship between Plaintiff Terminals and Cajun Energy presents a similar potential for duplicative recovery. In addition, any lost profits to Cajun result from more direct injuries to their customers who were dealers and distributors of gasohol. If these dealers and distributors later brought suit, Defendants claim that they could be subject to duplicative liability.

Defendants also argue that Plaintiffs are unable to demonstrate any antitrust injury. To show antitrust injury, a plaintiff must show an "injury of the type the antitrust laws were intended to prevent and that flows from that which makes Defendants' acts unlawful." *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.*, 429 U.S. 477, 489, 97 S.Ct. 690, 697, 50 L.Ed.2d 701 (1977).

b. Plaintiffs

Plaintiffs' arguments may be briefly summarized. They argue that ethanol is a substitute motor fuel because "[e]ach gallon of ethanol displaces one gallon of *motor fuel mix* that consumers purchase" and "a motorist can choose to purchase either fuel containing ethanol or fuel not containing ethanol." (Emphasis ours.)

They also claim that as competitors they have standing to challenge Defendants' boycott of ethanol and gasohol. [An interesting argument since Plaintiffs have never alleged a boycott.]

They argue in the alternative that if they are not competitors, under *Blue Shield of Virginia v. McCready*, 457 U.S. 465, 102 S.Ct. 2540, 73 L.Ed.2d 149 (1982), non-competitors, including suppliers to competitors have standing to sue. Finally, they maintain that they are not "second-best" plaintiffs, but if they are, even second-best plaintiffs have standing so long as their injuries are not derivative.

## II. ANALYSIS

### Monopolization Claims

We begin our analysis on a point largely ignored in Plaintiffs' final statement of contentions and proof—Plaintiffs' monopolization claims under § 2 of the Sherman Act.

In a memorandum filed in opposition to several Defendants' motions for summary judgment, Plaintiffs state in a footnote that discovery has not progressed far enough to allow them to fully set forth their monopolization claims and that, in view of the strength of the rest of their case, they "do not believe it necessary to pursue further the monopolization claims in order to prove their entitlement to the prayed-for relief. Accordingly, plaintiffs withdraw their Section 2 claims."

The Court treats Plaintiffs' purported withdrawal of the monopolization claims as a motion to dismiss those claims under Fed.R.Civ.P. 41(a)(2). Under Fed.R.Civ.P. 41(a)(2), the Court may dismiss a claim at the Plaintiffs' instance "upon such terms

and conditions as the Court deems proper." In this case, Plaintiffs' attempt to withdraw their monopolization claims includes what is basically an admission that they have not fully presented these claims in the Final Statement of Contentions and Proof and comes in the wake of several motions for summary judgment filed by various Defendants. The Court therefore deems it proper to dismiss with prejudice Count III of the Plaintiffs' and intervenors' complaints alleging monopolization activities in violation of § 2 of the Sherman Act and that portion of Count IV that alleges monopolization activities in violation of the Illinois antitrust laws.

### Permitted Conduct

Before addressing the question of standing directly, it is appropriate to consider whether some of the contentions in Plaintiffs' Final Statement of Contentions and Proof are even sufficient to state a claim.

■ Some of Plaintiffs' allegations ignore the nature of the obligations imposed by the antitrust laws. For example, Plaintiffs' complaint that the Defendants refused to disclose the MTBE content of their gasoline in order to make it easier for others to mix it into gasohol is basically a complaint that Defendants did not do enough to promote gasohol. However, businesses "needn't acquiesce to every demand placed upon them by competitors or customers; [their] duties are negative—to refrain from anticompetitive conduct—rather than affirmative—to promote competition." *Illinois ex rel Burris v. Panhandle Eastern Pipe Line Company*, 935 F.2d 1469, 1484 (7th Cir.1991), *cert. denied*, —— U.S. ——, 112 S.Ct. 1169, 117 L.Ed.2d 415 (1992) (citing *Olympia Equip. Leasing Co. v. Western Union Tel. Co.*, 797 F.2d 370, 375–376 (7th Cir.), *cert. denied*, 480 U.S. 934, 107 S.Ct. 1574, 94 L.Ed.2d 765 (1986)) (discussing duties of a monopolist).

■ Two rules are used to judge allegedly anticompetitive conduct. The "per se rule" is applied to types of conduct that "because of their pernicious effect on competition and lack of any redeeming virtue are conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry into the precise harm they have caused or the business excuse for their use." *Northwest Wholesale Stationers v. Pacific Stationery & Printing Co.*, 472 U.S. 284, 105 S.Ct. 2613, 86 L.Ed.2d 202 (1985) (quoting *Northern Pacific R. Co. v. United States*, 356 U.S. 1, 5, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958)). Examples of conduct subject to the per se rule include price fixing schemes, certain types of group boycotts, market allocations and tying arrangements. *Car Carriers, Inc. v. Ford Motor Co.*, 745 F.2d 1101, 1108 (7th Cir.1984) (citing *Havoco of Am., Ltd. v. Shell Oil Co.*, 626 F.2d 549, 555 (7th Cir. 1980)). Conduct not subject to the "per se rule" should generally be evaluated under the "rule of reason." *See Wilk v. American Medical Ass'n*, 895 F.2d 352, 359 (7th Cir.1990), *cert. denied*, 496 U.S. 927, 110 S.Ct. 2621, 110 L.Ed.2d 642 (1990). The "rule of reason" applies to "agreements whose competitive effect can only be evaluated by analyzing the facts peculiar to the business, the history of the restraint, and the reasons why it was imposed." *National Soc. of Professional Engineers v. United States*, 435 U.S. 679, 692, 98 S.Ct. 1355, 1365, 55 L.Ed.2d 637 (1978). The "threshold issue" in a rule of reason case is market power which is the ability to affect the allegedly restrained market. *Wilk v. American Medical Ass'n*, 895 F.2d at 359–360. Under either the "per se rule" or the "rule of reason" "the purpose of the analysis is to form a judgment about the competitive significance of the restraint...." *National Soc. of Professional Engineers*, 435 U.S. at 692, 98 S.Ct. at 1365.

Several of the Defendants' activities that Plaintiffs claim violate the antitrust laws need not be analyzed under either the "per se rule" or the "rule of reason" because they are either outside the reach of the antitrust laws or explicitly permitted under the section of the Clayton Act Plaintiffs allege was violated.

Plaintiffs' final statement states that Defendants have lobbied Congress and various state legislators in opposition to gasohol tax incentives and in favor of gasohol

labeling laws. [They do not, however, explain how Defendants' lobbying efforts in opposition to special tax incentives for gasohol differs from Plaintiffs' lobbying efforts in support of those same incentives.]

Plaintiffs gratuitously characterize Defendants' lobbying activities as "sham lobbying." Plaintiffs also complain that Defendants "followed and attempted to influence the activities of" the National Conference on Weights and Measures. That organization is, according to Plaintiffs, composed of state regulators. Three Supreme Court cases dealing with lobbying and the Sherman Act clearly undermine Plaintiffs' claims.

In *Eastern R.R. Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961), the Supreme Court stated that "the Sherman Act does not prohibit two or more persons from associating together in an attempt to persuade the legislature or the executive to take particular action with respect to a law that would produce a restraint or a monopoly." *Noerr Motor Freight, Inc.*, 365 U.S. at 136, 81 S.Ct. at 529. The Court went on to say that "at least insofar as the railroads' campaign was directed toward obtaining governmental action, its legality was not at all affected by any anticompetitive purpose it may have had." *Noerr Motor Freight, Inc.*, 365 U.S. at 139–40, 81 S.Ct. at 531. The legality of the railroads' campaign was not affected by the railroads' use of the "so-called third-party technique" which "depends upon giving propaganda actually circulated by a party in interest the appearance of being spontaneous declarations of independent groups." *Noerr Motor Freight, Inc.*, 365 U.S. at 140, 81 S.Ct. at 531. While such a campaign may not be ethical, "a publicity campaign to influence governmental action falls clearly into the category of political activity. The prescriptions of the Act, tailored as they are for the business world, are not at all appropriate for application in the political arena." *Noerr Motor Freight, Inc.*, 365 U.S. at 140–41, 81 S.Ct. at 531.

In *United Mine Workers v. Pennington*, 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965), the Supreme Court held that *"Noerr* shields from the Sherman Act a concerted effort to influence public officials regardless of intent or purpose." *Pennington* at 670, 85 S.Ct. at 1593. The Court stated further that "Joint efforts to influence public officials do not violate the antitrust laws even though intended to eliminate competition. Such conduct is not illegal, either standing alone or as part of a broader scheme itself violative of the Sherman Act." *Pennington* at 670, 85 S.Ct. at 1593.

In *Columbia v. Omni Outdoor Advertising, Inc.*, —— U.S. ——, 111 S.Ct. 1344, 113 L.Ed.2d 382 (1991), the Supreme Court refused to recognize a "conspiracy" exception to *Noerr* based on "the principle that the antitrust laws regulate business, not politics." *Omni Outdoor Advertising*, 111 S.Ct. at 1355. The *Omni Outdoor Advertising* Court also discussed the "sham" exception recognized in *Noerr*. In *Noerr*, the Court stated: "There may be situations in which a publicity campaign, ostensibly directed toward influencing governmental action, is a mere sham to cover what is actually nothing more than an attempt to interfere directly with the business relationships of a competitor and the application of the Sherman Act would be justified." *Noerr*, 365 U.S. at 144, 81 S.Ct. at 533.

In *Omni Outdoor Advertising*, the Court explained that "[a] sham situation involves a defendant whose activities are not genuinely aimed at procuring favorable government action at all, not one who genuinely seeks to achieve his governmental result but does so *through improper means.*" *Omni Outdoor Advertising*, 111 S.Ct. at 1354 (citations and quotation marks omitted) (emphasis in original). Plaintiffs' Final Statement contains no proof that Defendants' lobbying efforts were not intended to get results. In fact, Plaintiffs complain that Defendants' lobbying of the NCWM had its desired effect.

The Gasohol Competition Act of 1980 is central to Plaintiffs' case. Even their conspiracy claim under the Sherman Act is based on violations the Gasohol Competition Act. The Act provides:

**§ 26a. Restrictions on the purchase of gasohol and synthetic motor fuel**

**(a) Limitations on the use of credit instruments, sales, resales, and transfers**

Except as provided in subsection (b) of this section, it shall be unlawful for any person engaged in commerce, in the course of such commerce, directly or indirectly to impose any condition, restriction, agreement, or understanding that—

(1) limits the use of credit instruments in any transaction concerning the sale, resale, or transfer of gasohol or other synthetic motor fuel of equivalent usability in any case in which there is no similar limitation on transactions concerning such person's conventional motor fuel; or

(2) otherwise unreasonably discriminates against or unreasonably limits the sale, resale, or transfer of gasohol or other synthetic motor fuel of equivalent usability in any case in which such synthetic or conventional motor fuel is sold for use, consumption, or resale within the United States.

**(b) Credit fees; equivalent conventional motor fuel sales; labeling of pumps; product liability disclaimers; advertising support; furnishing facilities**

(1) Nothing in this section or in any other provision of law in effect on December 2, 1980, which is specifically applicable to the sale of petroleum products shall preclude any person referred to in subsection (a) of this section from imposing a reasonable fee for credit on the sale, resale, or transfer of the gasohol or other synthetic motor fuel referred to in subsection (a) of this section if such fee equals no more than the actual costs to such person of extending that credit.

(2) The prohibitions in this section shall not apply to any person who makes available sufficient supplies of gasohol and other synthetic motor fuels of equivalent usability to satisfy his customers' needs for such products, if the gasohol and other synthetic fuels are made available on terms and conditions which are equivalent to the terms and conditions on which such person's conventional motor fuel products are made available.

(3) *Nothing in this section shall—*

(A) *preclude any person referred to in subsection (a) of this section from requiring reasonable labeling of pumps dispensing the gasohol or other synthetic motor fuel referred to in subsection (a) of this section to indicate, as appropriate, that such gasohol or other synthetic motor fuel is not manufactured, distributed, or sold by such person;*

(B) preclude such person from issuing appropriate disclaimers of product liability for damage resulting from use of the gasohol or other synthetic motor fuel;

(C) require such person to provide advertising support for the gasohol or other synthetic motor fuel; or

(D) require such person to furnish or provide, at such person's own expense, any additional pumps, tanks, or other related facilities required for the sale of the gasohol or other synthetic motor fuel.

**(c) Definition**

As used in this section, "United States" includes the several States, the District of Columbia, any territory of the United States and any insular possession or other place under the jurisdiction of the United States.

15 U.S.C. § 26a(a) (emphasis ours).

■ Plaintiffs' Final Statement largely ignores the statements under § 26a(b) about what actions the Gasohol Competition Act of 1980 does not preclude or require. Without discussing § 26a(b)(3) or attempting in any way to show why it should not apply, Plaintiffs allege that Defendants violated both § 1 of the Sherman Act and § 26a by requiring its dealers to post signs on gasohol pumps clearly indicating that it was not straight gasoline and providing dealers with signs stating that the fuel being sold contains no alcohol.

The only indication that Plaintiffs' even read 26a(b)(3) is that Plaintiffs characterize Defendants' labeling requirements as unreasonable because they have an anticompetitive effect. Of course, there would be no purpose in stating that § 26a does not preclude reasonable labeling requirements

if a labeling requirement is only reasonable when not anticompetitive. If it is not anticompetitive, the labeling requirement would not bring the antitrust laws into effect and there would be no need for this exemption.

### Summary Judgment Standard

We turn, finally, to the question of whether the Defendants are entitled to summary judgment on the issue of antitrust standing. Under Fed.R.Civ.P. 56(c), summary judgment should be entered "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Unquestionably, in determining whether a genuine issue of material fact exists, the evidence is to be taken in the light most favorable to the non-moving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–59, 90 S.Ct. 1598, 1609, 26 L.Ed.2d 142 (1970). Nevertheless, the rule is also well established that the mere existence of some factual dispute will not frustrate an otherwise proper summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 2509, 91 L.Ed.2d 202 (1986). And in a case under § 1 of the Sherman Act, the permissible inferences which may be drawn from ambiguous evidence are limited and "conduct as consistent with permissible competition as with illegal conspiracy does not, standing alone, support an inference of antitrust conspiracy." *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 588, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986) (dealing specifically with an antitrust claim based on price competition).

### Standing to Sue for Treble Damages

The thirteen private Plaintiffs seek treble damages under § 4 of the Clayton Act. At this stage, the State of Illinois is pursuing only injunctive relief (its claims for statutory penalties under state law having been dismissed almost two years ago).

Initially, it must be remembered that "antitrust standing" to sue for treble damages under § 4 of the Clayton Act is more demanding than "constitutional standing." While injury in fact is sufficient to create "constitutional standing," further requirements must be met for "antitrust standing." *See Associated General Contractors, Inc. v. California State Council of Carpenters*, 459 U.S. 519, 535 n. 31, 103 S.Ct. 897, 907 n. 31, 74 L.Ed.2d 723 (1983). As the Supreme Court has stated:

> An antitrust violation may be expected to cause ripples of harm to flow through the nation's economy; but "despite the broad wording of § 4 there is a point beyond which the wrongdoers should not be held liable." [*Illinois Brick Co. v. Illinois*, 431 U.S. 720] at 760 [97 S.Ct. 2061, 2082, 52 L.Ed.2d 707 (1977)] (Brennan, J., dissenting). It is reasonable to assume that Congress did not intend to allow every person tangentially affected by an antitrust violation to maintain an action to recover threefold damages for the injury to his business or property. Of course, neither the statutory language nor the legislative history of § 4 offers any focused guidance on the question of which injuries are too remote from the violation and the purposes of the antitrust laws to for the predicate for a suit under § 4; indeed, the unrestrictive language of the section, and the avowed breadth of the congressional purpose, cautions us not to cabin § 4 in ways that will defeat its broad remedial objective. But the potency of the remedy implies the need for some care in its application. In the absence of direct guidance from Congress, and faced with the claim that a particular injury is too remote from the alleged violation to warrant § 4 standing, the courts are thus forced to resort to an analysis no less elusive than that employed traditionally by the courts at common law with respect to the matter of "proximate cause."

*Blue Shield of Virginia v. McCready*, 457 U.S. 465, 476–477, 102 S.Ct. 2540, 2547, 73 L.Ed.2d 149 (footnote and citations omitted) (1982). More recently, the Supreme Court

stated that with respect to both proximate cause and standing to sue for treble damages that "the infinite variety of claims that may arise make it virtually impossible to announce a black-letter rule that will dictate the result in every case." *Associated General Contractors, Inc.*, 459 U.S. at 536, 103 S.Ct. at 908 (footnote omitted).

While there is no black-letter rule for determining the existence of antitrust standing, the Supreme Court has identified the following relevant factors for making that determination:

(1) the causal connection between the alleged antitrust violation and the harm;

(2) whether the Defendants intended to cause the harm;

(3) the nature of the injury, specifically, whether the "injury was of a type" that Congress sought to redress by providing a private remedy for antitrust violations;

(4) the directness or indirectness of the alleged injury;

(5) the speculative nature of the claimed damages; and

(6) the risk of duplicate recoveries or the danger of complex apportionment of damages.

*Associated General Contractors, Inc.*, 459 U.S. at 537–545, 103 S.Ct. at 908–912. We consider each of the factors for antitrust standing in turn.

[11] *Causal connection.* The causal connection between the alleged antitrust violations and the harm claimed by Plaintiffs is weak. Although Plaintiffs occasionally state that Defendants intended to harm ethanol and gasohol, it is abundantly clear from the record that the actions Plaintiffs complain of could have only indirectly injured ethanol sales. It is also significant that the time periods when various Plaintiffs encountered their worst economic woes fall within the time period from 1978 to 1987 during which period nationwide gasohol sales increased by more than 4,000%. Obviously, some ethanol producers must have been enjoying dramatically increased sales, most probably the larger ethanol producers such as Archer Daniels Midland and A.E. Staley identified in the suit by Alpebo, Shepherd, and two other

companies against the Secretary of the Department of Agriculture.

*Intent.* There is no evidence that the Defendants intended to injure ethanol producers or gasohol wholesalers. The question of intent, however, is not controlling. *See Blue Shield of Virginia v. McCready*, 457 U.S. 465, 102 S.Ct. 2540, 73 L.Ed.2d 149 (1982) (absence of specific intent to harm plaintiff does not render injury remote).

*Nature of the injury.* The antitrust laws "were enacted for the 'protection of *competition*, not *competitors*.'" *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.*, 429 U.S. at 488, 97 S.Ct. at 697 (quoting *Brown Shoe Co. v. United States*, 370 U.S. 294, 320, 82 S.Ct. 1502, 1521, 8 L.Ed.2d 510 (1962)). In order to recover treble damages, Plaintiffs "must prove more than injury causally linked to an illegal presence in the market. Plaintiffs must prove *antitrust* injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes the defendants' acts unlawful." *Brunswick*, 429 U.S. at 489, 97 S.Ct. at 697. If, as appears probable in this case, Plaintiffs' loss of market share was a result of being unable to compete with larger ethanol and gasohol producers, they clearly fail to satisfy the standard.

*Directness of the injury.* As already stated, the injuries allegedly suffered by the private Plaintiffs are remote. Plaintiffs claim that Defendants disparaged gasohol and restrained competition between gasohol and gasoline. And they agree with the Defendants that the relevant market is the motor fuels market. Plaintiffs claim that every drop of ethanol contained in gasohol displaces a drop of gasoline simply does not mean that ethanol and gasoline compete with one another in the market. As of yet, cars don't run on pure ethanol. Plaintiffs' argument that because the drop of gasohol replaces the drop of gasoline the two products compete in the market is wholly untenable. Automobiles contain countless screws and bolts. When a Ford is sold, a different batch of nuts and bolts is on the roadway than when a Cadillac is sold. Nonetheless, the supplier of

nuts and bolts to Cadillac is not by itself a competitor of Ford.

Plaintiffs also argue that Defendants wronged their dealers in numerous ways. These allegations are perhaps summed up in Plaintiffs' claims that Defendants' dealers were kept in "economic serfdom." None of the Plaintiffs, however, were dealers nor were they generally selling gasohol to dealers. Therefore any effect on Plaintiffs that could have occurred if Defendants prohibited their dealers from selling gasohol is both indirect and remote.

Defendants assert that under *Southwest Suburban Bd. of Realtors, Inc. v. Beverly Area Planning Ass'n,* 830 F.2d 1374 (7th Cir.1987), Plaintiffs lack standing because they are neither competitors nor consumers in the relevant market. Plaintiffs' maintain that *Blue Shield of Virginia v. McCready,* 457 U.S. 465, 102 S.Ct. 2540, 73 L.Ed.2d 149 (1982) opens up the door to non-competitors including suppliers. Neither proposition is quite correct.

In *McCready,* the Supreme Court allowed a consumer of psychological services to bring suit under the antitrust laws based on an alleged conspiracy between Blue Shield of Virginia and the Neuropsychiatric Society of Virginia to deny reimbursement to insureds who utilized psychologists (as opposed to psychiatrists) unless the treatments was billed through a physician. Under the facts of that case, the Court considered it unreasonable to restrict the antitrust remedy to the competitors the conspirators were attempting to exclude from the market. *McCready,* 457 U.S. at 479, 102 S.Ct. at 2548. "Denying reimbursement to subscribers for the cost of treatment was the very means by which it is alleged that Blue Shield sought to achieve its illegal ends. The harm to McCready and her class was clearly foreseeable; indeed, it was a necessary step in effecting the ends of the alleged conspiracy." *McCready,* 457 U.S. at 479, 102 S.Ct. at 2548. The Court therefore rejected Defendants' claims that McCready's alleged injury was too fortuitous, incidental and remote to provide her with antitrust stand-

ing. *McCready,* 457 U.S. at 478, 102 S.Ct. at 2547.

In distinguishing *McCready* from earlier cases, the Supreme Court emphasized that while it was McCready's employer who was the "consumer" in the sense that it paid for insurance coverage, it was McCreary who suffered the out of pocket loss since she had paid the treating psychologist. The Court noted that while *Hawaii v. Standard Oil Co.,* 405 U.S. 251, 92 S.Ct. 885, 31 L.Ed.2d 184 (1972) and *Illinois Brick Co. v. Illinois,* 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977) focused on the risk of duplicative recovery in allowing parties down the distribution chain to claim damages, allowing McCready and her class "to proceed in the circumstances of this case offers not the slightest possibility of a duplicative exaction from petitioners." *McCready,* 457 U.S. at 473–475, 102 S.Ct. at 2545–2546. Obviously, the unusual lack of risk of duplicative recoveries in the *McCready* case is not common to this case.

In *Southwest Suburban Bd. of Realtors, Inc.,* the case cited by Defendants for the proposition that Plaintiffs lack standing because they are neither suppliers nor consumers in the relevant market, the Seventh Circuit denied standing to an association of realtors. And the Seventh Circuit did, in fact, point out that the board was neither a supplier nor a purchaser in the brokerage services market that was allegedly restrained. *Southwest Suburban Bd. of Realtors, Inc.,* 830 F.2d at 1379. More importantly, however, the Seventh Circuit stated that "[m]erely derivative injuries sustained by employees, officers, stockholders, and creditors of an injured company do not constitute 'antitrust injury' sufficient to confer standing." *Southwest Suburban Bd. of Realtors, Inc.,* 830 F.2d at 1378 (citing *Associated General Contractors, Inc. v. California State Council of Carpenters,* 459 U.S. 519, 533–535 and 541, 103 S.Ct. 897, 906–907 and 910).

We do not perceive any substantial inconsistency between *Southwest Suburban Bd. of Realtors, Inc.* and *McCready.* Neither case indicates that a party who suffers an

injury derivative of an injury to a competitor or customer has standing.

While our decision must be based on the factors set forth in the Supreme Court's decision in *Associated General Contractors, Inc.*, we nonetheless briefly consider Plaintiffs' general contention that suppliers have standing. While the approach set out in *Associated General Contractors, Inc.* has replaced earlier tests for antitrust standing, we note that the weight of authority in earlier cases held that suppliers did not have standing to seek monetary damages. *See e.g., Hauer v. Bankers Trust New York Corp.*, 425 F.Supp 796 (E.D.Wis.1977) (target area test); *Associated Radio Serv. Co. v. Page Airways, Inc.*, 624 F.2d 1342 (5th Cir.1980), *cert. denied*, 450 U.S. 1030, 101 S.Ct. 1740, 68 L.Ed.2d 226 (1981) (target area test); *Volasco Products. Co. v. Lloyd A. Fry Roofing Co.*, 308 F.2d 383 (6th Cir.1982), *cert. denied*, 372 U.S. 907, 83 S.Ct. 721, 9 L.Ed.2d 717 (1963) (direct injury test). *But see, South Carolina Council of Milk Producers, Inc. v. Newton*, 360 F.2d 414 (4th Cir.), *cert. denied*, 385 U.S. 934, 87 S.Ct. 295, 17 L.Ed.2d 215 (1966) (supplier had standing under target area test). Aside from their strained interpretation of *McCready*, Plaintiffs have not cited us any cases establishing a general rule that suppliers have antitrust standing.

■ *Speculative nature of claimed damages.* The speculative nature of Plaintiffs' damages is the stake through the heart of Plaintiffs' damages claim. The Plaintiffs who are wholesale distributors of gasohol sell to gasohol retailers. The Plaintiffs who are ethanol producers sell to gasohol blenders or, in at least on case, to an ethanol upgrader. Thus, any injury they suffer as a result of an injury to the retail motor fuels market is obviously derivative.

Even more significant than the remoteness of the alleged injuries is the abundance of other possible causes for Plaintiffs' economic woes. Plaintiffs suffered a decrease in demand even while the market for gasohol was increasing dramatically. When gasoline prices fell in 1986, several small ethanol producers (including at least a couple of the private Plaintiffs in this case) were hurt not just by the price competition between gasoline and gasohol and its resulting downward pressure on ethanol prices, but by the fact that corn and grain-based ethanol producers benefited from temporary Department of Agriculture subsidies that were not available to ethanol producers using other feedstocks.

Plaintiffs' claim that gasohol sales were diminished by the delay in the adoption of a standard specification is not supported by the evidence. Plaintiffs' assertion that "as a practical matter, an automotive spark-ignition fuel that does not meet ASTM specifications cannot be legally sold in the United States" is incredible in light of the more than 4000% increase in gasohol sales between 1978 and 1987. It was in 1988, *the year the specification for gasohol was adopted*, that gasohol sales began to sag.

Simply stated, Plaintiffs' Final Statement, filed 33 months into this case, reveals a case based more on innuendo than evidence.

*Risk of duplicative recoveries and danger of complex apportionment.* The risk of duplicative recoveries and the danger of complex apportionment are affected by some of the factors already discussed. As previously stated, the damage Defendants' actions allegedly caused Plaintiffs is derivative of more direct damages that those allegedly caused gasohol retailers. The speculative nature of the claimed damages is apparent from the existence of other possible, and frankly much more probable causes of the private Plaintiffs' economic losses.

The derivative nature of Plaintiffs' claimed damages combined with the highly speculative nature of the damages leads this Court to conclude that granting Plaintiffs standing would run the risk of duplicative recoveries *and*, should Plaintiffs prevail, guarantee complex apportionment of damages. We therefore hold that the 13 private Plaintiffs involved in this suit lack standing to pursue their treble damages claims as a matter of law.

*Injunctive Relief*

### i. Private Plaintiffs

■ We turn then to the question of whether the thirteen private Plaintiffs have standing to pursue injunctive relief. The Supreme Court has determined that "in order to seek injunctive relief ... a private plaintiff must allege threatened loss or damage 'of the type the antitrust laws were designed to prevent and that flows from that which makes defendants' acts unlawful.'" *Cargill, Inc. v. Monfort of Colorado, Inc.,* 479 U.S. 104, 113, 107 S.Ct. 484, 491, 93 L.Ed.2d 427 (1986). Injunctive relief is available for private parties "against threatened loss or damage by violation of the antitrust laws ... when and under the same conditions and principles as injunctive relief against threatened conduct that will cause loss or damage is granted by courts of equity...." 15 U.S.C. § 26, Clayton Act § 16. Before looking at the elements Plaintiffs must satisfy in order to obtain injunctive relief, the Court observes that the private Plaintiffs request for injunctive relief in this case does not appear serious. Plaintiffs' Final Statement fails to even address the requirements that must be satisfied before injunctive relief can be granted.

The record reveals also that several Plaintiffs are no longer in the ethanol production or gasohol blending business. As already stated, in order to obtain injunctive relief, "a private plaintiff must allege threatened loss or damage 'of the type the antitrust laws were designed to prevent and that flows from that which makes the defendants' acts unlawful.'" *Cargill, Inc. v. Monfort of Colorado, Inc.,* 479 U.S. 104, 113, 107 S.Ct. 484, 491, 93 L.Ed.2d 427 (1986). Obviously a plaintiff who has already gone out of business no longer faces a threat of loss or damage. Nonetheless, Plaintiffs make no mention of the fact that not all Plaintiffs can possibly be entitled to injunctive relief. The request by the private Plaintiffs for injunctive reliefs was casually thrown into the Plaintiffs' complaints and prayer for relief and, accordingly, it is now a throw away.

### ii. State of Illinois

Defendants have not challenged the standing of the State of Illinois to pursue the alleged antitrust violation and the State clearly stands on a different footing, when it comes to antitrust standing, than do the private Plaintiffs. The Court is aware that the dismissal of the original Plaintiffs to this suit does not require the dismissal of a party that has intervened. *See United States Steel Corporation v. Environmental Protection Agency,* 614 F.2d 843 (3rd Cir.1979); *Magdoff v. Saphin Television & Appliance, Inc.,* 228 F.2d 214 (5th Cir. 1955). Nonetheless, several factors lead the Court to conclude that the State's case should be dismissed without prejudice.

■ The State of Illinois intervened in this action almost two years after it was filed seeking injunctive relief and state statutory penalties. Most of the injuries claimed by the state of Illinois, including their claims that Defendants' actions adversely affected the public health, increased the cost of meeting Clean Air Standards, and deprived Illinois of the economic development that a larger ethanol industry would have brought, are not of the type that the antitrust laws were intended to redress.

The State's prayers for statutory penalties were dismissed in July of 1990, leaving the State in this case only for injunctive relief.

The State of Illinois has been a follower in this case and has candidly stated that it "does not have the allocable resources to vigorously pursue the prosecution of this lawsuit on its own, absent the resources of private counsel...."

In addition, the State of Illinois' complaint is clearly rendered from the complaint of the private Plaintiffs. Likewise, the contentions and proof of State of Illinois are not discussed separately in the Final Statement of Contentions and Proof. Yet, it is clear from the record that the State of Illinois case is not the same as the private Plaintiffs. For example, Plaintiffs allege that the Defendants violated the Sherman Act and the Gasohol Competition Act of 1980 with their "no alcohol" advertising, yet in the Final Statement of Con-

tentions and Proof only three Defendants are identified as having conducted such advertising campaigns within Illinois. In addition, a 1986 map included in the last appendix to Plaintiffs' Final Statement shows the percentage of ethanol blends (presumably as compared to all motor fuel sales) at more than 24 percent. By contrast, in some states ethanol blend sales are less than 1 percent of total motor fuel sales. Obviously, this raises significant questions about whether the Illinois motor fuels market was affected by any of Defendants' alleged antitrust violations. Plaintiffs' Final Statement, however, simply fails to focus in on this or many other points that bear on the State of Illinois' claim.

Should the State of Illinois wish to pursue its claims, it would be in the best interest of both the parties and the Court if it did so in a new suit tailored to its individual situation.

### III. CONCLUSION

*Ergo,* Count III of the Plaintiffs' and Intervenors' complaints alleging monopolization activities in violation of § 2 of the Sherman Act and that part of Count IV that alleges monopolization activities in violation of the Illinois antitrust laws are DISMISSED WITH PREJUDICE.

Defendants' Motion for Summary Judgment based on Plaintiffs' Lack of Antitrust Injury and Standing is ALLOWED IN PART as it pertains to Counts I and II alleging, respectively, "a contract, combination or conspiracy" in violation of section 1 of the Sherman Act and violations of the Gasohol Competition Act of 1980, section 26a of the Clayton Act.

The State of Illinois claims under Counts I and II are DISMISSED WITHOUT PREJUDICE.

The Illinois Fraud and Deceptive Practices Act claim under Count IV and the commercial disparagement claim in Count V are DISMISSED WITHOUT PREJUDICE for lack of jurisdiction.